**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TENNESSEE**
**AT WINCHESTER**

| | | |
|---|---|---|
| JUSTIN BRADLEY MARTIN, | ) | |
| | ) | |
| *Plaintiff*, | ) | Case 4:24-cv-9 |
| | ) | |
| v. | ) | Judge Atchley |
| | ) | |
| LINCOLN COUNTY, *et al.*, | ) | Magistrate Judge Dumitru |
| | ) | |
| *Defendants*. | ) | |

**MEMORANDUM AND ORDER**

Plaintiff Justin Bradley Martin, by and through counsel, filed a Second Amended Complaint under 42 U.S.C. § 1983 and State law related to events that transpired while he was housed as a pretrial detainee in the Lincoln County Jail ("Jail") [Doc. 67]. Before the Court is Defendants' motion for summary judgment [Doc. 95], which is accompanied by a supporting memorandum [Doc. 96] and exhibits [Docs. 88, 89, 90, 91, 92, 94]. Plaintiff has responded in opposition to the motion [Doc. 105] and submitted supporting documents [Docs. 105-1–105-3]. Defendants filed objections to the Declarations filed by Plaintiff [Doc. 106] and a reply to Plaintiff's response to their summary judgment motion [Doc. 107]. Upon consideration of the Parties' pleadings, the competent evidence, and the applicable law, Defendants' motion will be **GRANTED**, and this action will be **DISMISSED**.

## I. LEGAL STANDARD

Summary judgment is proper when the pleadings and evidence, viewed in a light most favorable to the nonmoving party, illustrate that no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). A fact is deemed "material" if resolving that fact in favor of one party "might affect the outcome of the suit under governing law."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To establish an entitlement to summary judgment, the moving party must demonstrate that the nonmoving party cannot establish an essential element of his case for which he bears the ultimate burden of proof at trial. *Celotex*, 477 U.S. at 322; *Moore v. Philip Morris Cos., Inc.*, 8 F.3d 335, 339 (6th Cir. 1993).

Once the motion is properly supported with competent evidence, the nonmovant must show that summary judgment is inappropriate by setting forth specific facts showing there is a genuine issue for trial. *Celotex*, 477 U.S. at 323; *Anderson*, 477 U.S. at 249. If the "evidence is such that a reasonable jury could return a verdict for the nonmoving party," then there is a genuine dispute as to a material fact. *Anderson*, 477 U.S. at 248. If no proof is presented, however, the Court does not presume that the nonmovant "could or would prove the necessary facts." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citing *Lujan v. Nat'l Wildlife Fed'n.*, 497 U.S. 871, 889 (1990)). That is, to successfully oppose a motion for summary judgment, "the non-moving party . . . must present sufficient evidence from which a jury could reasonably find for him." *Jones v. Muskegon Cnty.*, 625 F.3d 935, 940 (6th Cir. 2010).

The very purpose of summary judgment is to "pierce the pleadings and assess the proof in order to see whether there is a genuine issue for trial." Fed. R. Civ. P. 56 advisory committee's note to 1963 amendment. Indeed, "[t]he amendment is not intended to derogate from the solemnity of the pleadings." *Id.* Rather the amendment "recognizes that despite the best efforts of counsel to make his pleadings accurate, they may be overwhelmingly contradicted by the proof available to his adversary." *Id.* The non-moving party must come forward with proof to support each element of his claim and cannot meet this burden with "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986), "conclusory allegations," *Lujan*, 497 U.S. at 888, or by a mere "scintilla" of evidence, *Anderson*, 477 U.S. at

252. It would undermine the purposes of summary judgment if a party could defeat such a motion simply by "replac[ing] conclusory allegations of the complaint or answer with conclusory allegations of an affidavit." *Lujan*, 497 U.S. at 888.

## II. SUMMARY JUDGMENT EVIDENCE

On October 17, 2023, inmates A.J. Hicks and Roy Hardin assaulted Plaintiff inside cell block 147 of the Lincoln County Jail [Doc. 90-3, at 3]. The incident began when, as Plaintiff was lying on his bunk, Inmate Hicks approached Plaintiff's bunk, flipped a towel hanging from Plaintiff's bunk, and walked down the tier [Doc. 90-1, at 00:00–02:16[1]; Doc. 90-2 ¶¶ 1–2]. Plaintiff stood, readjusted the towel, and sat on his bunk [Doc. 90-1, at 02:28–2:54; Doc. 90-2 ¶¶ 3–4]. Inmate Hicks reapproached Plaintiff and initiated a physical confrontation [Doc. 90-1, at 02:54–3:06; Doc. 90-2 ¶ 4]. Inmate Hicks body-slammed Plaintiff onto the floor, struck him repeatedly, and, at one point, wrapped an object around Plaintiff's throat and choked him for several seconds [Doc. 90-1, at 03:07–04:15; Doc. 90-2 ¶¶ 5–6]. Inmate Hicks got off Plaintiff and allowed Plaintiff to stand up, then he punched Plaintiff again several times before walking to the other end of the tier [Doc. 90-1, at 04:16–06:06; Doc. 90-2 ¶¶ 7–9]. Shortly thereafter, Inmate Hicks started walking down the stairs before turning around, jogging back upstairs, and attacking Plaintiff again [Doc. 90-1, at 07:11–7:34; Doc. 90-2 ¶ 10]. Inmate Hicks then walked down the stairs to the lower-level bathroom while Plaintiff limped down the hall to the upstairs bathroom [Doc. 90-1, at 08:01–10:26; Doc. 90-2 ¶ 11].

Inmate Roy Hardin, while shadowboxing, walked from the top tier to the bottom tier and interacted with Inmate Hicks in the bottom-tier bathroom [Doc. 90-1, at 10:48–12:17; Doc. 90-2

[1] These timestamps should be considered approximate, despite the Court's efforts at accuracy.

¶¶ 12–14]. Inmate Hardin then went upstairs, entered the bathroom where Plaintiff was, and began to punch and hit Plaintiff [Doc. 90-1, at 11:29–12:34; Doc. 90-2 ¶¶ 12–14]. The altercation ended when Defendant Mike Shardo[2] entered the housing unit to conduct a routine round [Doc. 90-1, at 13:01; Doc. 90-2 ¶ 16; Doc. 89 ¶ 7].

Defendant Shardo was unaware that any assault had occurred when he entered the housing unit [Doc. 89 ¶ 7]. Once upstairs, Defendant Shardo observed Plaintiff appearing injured and inquired whether anything had happened, but Plaintiff denied anything was wrong [*Id.*]. After leaving the block and continuing his duties, Defendant Shardo was informed by another inmate in cell block 148 that an altercation had occurred in block 147 [*Id.* ¶ 8]. At that point, Defendant Shardo notified his supervising sergeant of this information [*Id.*]. After the sergeant confirmed via video review that an altercation had occurred, Defendant Shardo assisted in removing Plaintiff and the assailants from the housing unit for investigation [*Id.* ¶ 9]. Emergency medical services were contacted to transport Plaintiff for treatment [*Id.* ¶ 10]. At the hospital, it was discovered that Plaintiff had sustained lacerations to his face, head, and neck, as well as a fracture to his left hip, during the assault [Doc. 105-1 ¶ 5].

Plaintiff was transported to Lincoln Health System, where he was provided pain medication and had a laceration repaired before being transported to Vanderbilt Tullahoma-Harton Hospital ("Vanderbilt") for treatment of his hip [Doc. 90 ¶ 12; Doc. 94-1 ¶ 13]. Plaintiff maintains that at Vanderbilt, unidentified medical staff advised Plaintiff that his hip would require surgery and follow-up orthopedic care, and Plaintiff expected to receive surgery during his hospitalization [Doc. 105-1 ¶¶ 7, 8]. However, the treating orthopedic surgeon at Vanderbilt recommended

---

[2] This Defendant is identified as "Mike Chardo" in the Second Amended Complaint [Doc. 67].

conservative treatment of Plaintiff's hip with weight bearing as tolerated [Doc. 90 ¶ 13; Doc. 94-2, at 1]. Plaintiff was cleared for discharge back to the Jail, with instructions to follow up with Dr. Peterson in two weeks and his primary care physician in one week [*Id.*]. Plaintiff was counseled on these recommendations, and Plaintiff agreed [*Id.*]. Upon his return to the Jail, Plaintiff was under the care of third-party medical provider Quality Correctional Health Care ("QCHC") through its medical staff [Doc. 90 ¶¶ 10, 14; *see also* Doc. 94-3].

On October 25, 2023, QCHC medical staff removed Plaintiff's sutures, found no sign of infection, and found no sign of redness [Doc. 94-3, at 2]. The same day, Plaintiff was seen by a QCHC physician who noted that Plaintiff's medical records indicated no surgery was required, that Plaintiff stated he "feels fine," and that Plaintiff stated he wanted to return to general population [*Id.* at 3]. Based on the medical observation records and the physician's orders, Plaintiff was released from medical observation on October 25 [*Id.*].

After his return to the Jail, Plaintiff repeatedly requested follow-up orthopedic care through the Jail's kiosk system, which is the vehicle inmates use to file grievances or request medical attention at the Jail [Doc. 105-1 ¶ 10; Doc. 90 ¶ 10]. Grievances are addressed by Jail employees, while medical requests are addressed by QCHC medical professionals [Doc. 89 ¶¶ 11–12; Doc. 90 ¶ 10]. Correctional officers do not have authority over or access to QCHC's medical decisions [Doc. 89 ¶ 11].

Plaintiff testifies that despite his kiosk requests, he failed to timely receive the recommended follow-up appointments [Doc. 105-1 ¶¶ 10, 14]. Instead, nearly five months after the assault, Plaintiff was seen by Bryan Berry, NP, at Brian Peterson Orthopedics in Tullahoma on March 4, 2024 [*Id.* ¶ 11]. Plaintiff states he was diagnosed with severe left hip osteoarthritis and grade 2 spondylolisthesis at L5-S1 and was told he needed to follow up with a hip specialist,

Dr. Thomas Byrd [*Id.*]. However, no appointment was made for Plaintiff to see Dr. Byrd [*Id.* ¶¶ 11–12]. Plaintiff testifies that, because of the delay and denial of orthopedic care, he experiences persistent and ongoing pain in his left hip, lower back, and left leg, as well as numbness and difficulty walking [*Id.* ¶ 13].

The individual Defendants, all Lincoln County employees, deny having interfered with Plaintiff's medical treatment [*See, e.g.*, Docs. 88, 89, 90]. Plaintiff never requested medical care from Defendant Shardo, and Defendant Shardo testifies he never denied or interfered with Plaintiff's medical treatment [Doc. 89 ¶¶ 11–12]. Defendant Joyce McConnell, the Interim Sheriff, was generally aware of the assault and the subsequent investigation and criminal charges against the assailants, who pleaded guilty to the charges against them [Doc. 88 ¶¶ 3–5; Doc. 90 ¶ 1–9]. And although Defendant McConnell was the final policymaker for the Jail, she was not involved in the day-to-day operations, which were handled by the Jail Administrator and other staff [Doc. 88 ¶¶ 1–2]. As for the day-to-day operations, Jail Administrator Vicky Afisov swears she had no involvement in Plaintiff's medical treatment, did not communicate with his healthcare providers, is unaware of any medical professional recommending surgery for Plaintiff, and is unaware of any Jail staff interfering with medical decisions [Doc. 88 ¶¶ 6–9].

However, Dr. John Johnson, who holds a Ph.D. and "has extensive professional experience in correctional facility management, auditing, and compliance with industry standards[,]" was retained by Plaintiff to review case-specific documents and relevant guidelines and offer a professional opinion as to Defendants' compliance with accepted industry practices and norms [Doc. 105-2 ¶¶ 6–10; Doc. 105-3 ¶ 9; *see also* Doc. 105-2, at 3]. Dr. Johnson states that his case review found that (1) Plaintiff was denied surgical intervention and orthopedic follow-up recommended by Vanderbilt and Dr. Berry; (2) "there are indications that [Lincoln County]

superseded these medical recommendations by refusing to pay for the services"; and (3) the lack of deference to medical professionals was a departure from best correctional practices and the standards established by the American Correctional Association ("ACA") and the National Commission on Correctional Health Care ("NCCHC")[3] [Doc. 105-2 ¶¶ 13–15; Doc. 105-3 ¶ 23].

## III. ANALYSIS

To state a claim for relief under 42 U.S.C. § 1983, a plaintiff must establish that a "person" acting "under color of" state law deprived him of "any rights, privileges, or immunities secured by the Constitution and laws" of the United States. 42 U.S.C. § 1983. Defendants do not dispute that they were acting under color of state law at all relevant times.

### A. Agreed Dismissal/Abandoned Claims

Plaintiff's operative complaint contains two causes of action. First, he claims that Defendants' conduct violated his constitutional right to adequate medical care under 42 U.S.C. § 1983 [Doc. 67, at 10–12]. Second, he maintains that the individual Defendants' conduct constituted the tort of intentional infliction of emotional distress ("IIED") [*Id.* at 12–13]. In their motion for summary judgment, Defendants McConnell and Shardo assert the defense of qualified immunity as to Plaintiff's § 1983 medical-care claim and maintain that Plaintiff's IIED claim fails as a matter of law [*See* Doc. 96, at 7–15].

---

[3] Dr. Johnson also offers opinions relevant to the Amended Complaint's allegations that Defendants failed to protect Plaintiff from the assault giving rise to his injuries, which presumably serves at the basis for Plaintiff's intentional infliction of emotional distress ("IIED") claim [*See* Docs. 105-2, 105-3; *see also* Doc. 67 ¶¶ 22, 24, 48–54]. But as set forth below, this claim has been abandoned, and recitation of Dr. Johnson's opinions regarding this issue is, therefore, unnecessary.

In response to Defendants' motion, Plaintiff "agrees to the dismissal of the individual Defendants in this case" [Doc. 105, at 1]. Therefore, based on the Parties' agreement that the individual Defendants should be dismissed, they will be dismissed from this action.

Further, Plaintiff does not address Defendants' qualified immunity defense or IIED arguments [*See generally id.*]. Plaintiff's failure to address Defendants' arguments for summary judgment constitutes abandonment of those claims, and this provides an independent basis for summary judgment. *See Granderson v. Graulau*, No. 3:23-CV-01031, 2025 WL 1126546, at *4 (M.D. Tenn. Apr. 16, 2025) (collecting cases finding that a plaintiff's failure to respond to a defense of qualified immunity is a sufficient basis upon which to grant a summary judgment motion based on qualified immunity); *see also Brown v. VHS of Mich., Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013) ("This Court's jurisprudence on abandonment of claims is clear: a plaintiff is deemed to have abandoned a claim when [he] fails to address it in response to a motion for summary judgment."). Therefore, Plaintiff's IIED claim and all individual-liability claims against Defendants McConnell, Chardo, and John/Jane Does are **DISMISSED**. [4]

### B. Official-Capacity Claims

An official capacity claim against a government official "generally represent[s] only another way of pleading an action against an entity of which the officer is an agent." *Kentucky v.*

[4] Although neither Party raises the issue, the Court notes that Plaintiff has never identified or served any of the John/Jane Doe Defendants. And the statute of limitations against these Defendants has expired. *Foster v. State*, 150 S.W.3d 166, 168 (Tenn. Ct. App. 2004) (applying the one-year statute of limitations from Tenn. Code Ann. § 28-3-104 in a § 1983 claim); *see also Wallace v. Kato*, 549 U.S. 384, 387 (2007) (holding federal courts borrow the forum state's statute of limitations for personal injury actions in § 1983 actions). Therefore, as a matter of law, the statute of limitations bars Plaintiff's claims against the John/Jane Doe Defendants, and this serves as an independent basis to dismiss these Defendants. *See Cox v. Treadway*, 75 F.3d 230, 240 (6th Cir. 1996) (holding filing of a complaint against John Doe defendants does not toll running of statute of limitations against those parties); *see also* Fed. R. Civ. P. 21 (providing "[o]n motion or on its own, the court may, at any time, on just terms, add or drop a party").

*Graham*, 473 U.S. 159, 165 (1985) (citation omitted). Accordingly, the Court will dismiss Plaintiff's claims against Defendants in their official capacities, as they are redundant to his claims against Lincoln County. *See, e.g.*, *Foster v. Michigan,* 573 F. App'x 377, 390 (6th Cir. 2014) ("Where the entity is named as a defendant, an official capacity claim is redundant."); *Schirmer v. Powell Cnty. Det. Ctr*., 685 F. Supp. 3d 459, 463 (E.D. Ky. 2023) (dismissing as redundant official-capacity claims against sheriff and jailer where same claims were raised against governmental entities).

### C. Lincoln County

Thus, the only remaining claim to resolve on summary judgment is Plaintiff's claim that Lincoln County was deliberately indifferent to his need for medical care. Because he was a pretrial detainee at all relevant times, Plaintiff can sustain such a claim by demonstrating that (1) he had a sufficiently serious medical need that (2) Lincoln County responded "deliberately (not accidentally), [and] also recklessly 'in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known.'" *Helphenstine v. Lewis Cnty*., 60 F.4th 305, 317 (6th Cir. 2023) (citations omitted).

But "under § 1983, local governments are responsible only for 'their *own* illegal acts.'" *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (quoting *Pembaur v. Cincinnati*, 475 U.S. 469, 479 (1986)). Accordingly, Plaintiff cannot recover against Lincoln County "for an injury inflicted solely by its employees or agents." *Monell v. Dep't of Soc. Servs*., 436 U.S. 658, 694 (1978). Instead, the County is subject to liability only where "execution of a [its] policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury[.]" *Id.*

Such claims, commonly referred to as *Monell* claims, require a plaintiff to show "an affirmative link between [a county's] policy or custom and the particular constitutional violation alleged." *City of Okla. City v. Tuttle*, 471 U.S. 808, 823 (1985). Thus, to hold Lincoln County liable under *Monell*, "a plaintiff must identify the policy, connect the policy to the [county] itself and show that the particular injury was incurred because of the execution of that policy." *Garner v. Memphis Police Dep't*, 8 F.3d 358, 364 (6th Cir. 1993) (citation and internal quotation marks omitted).

"The plaintiff must also demonstrate that, through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged." *Bd. of Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 404 (1997). "That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Id.* "Where a court fails to adhere to rigorous requirements of culpability and causation, municipal liability collapses into *respondeat superior* liability." *Id.* at 415.

Plaintiff maintains that Defendants, despite knowing that medical experts recommended Plaintiff have surgery, returned Plaintiff to the Jail without surgery because of a Lincoln County policy and custom of attempting to save money at Plaintiff's expense, and that it acted deliberately in failing to take Plaintiff to the necessary follow-up orthopedic appointments [*See, e.g.,* Doc. 67 ¶¶ 27, 30, 32, 41, 45]. These allegations in an unsworn complaint, however, are not evidence. *El Bey v. Roop*, 530 F.3d 407, 414 (6th Cir. 2008) (providing a sworn complaint "carries the same weight" as an affidavit for purposes of summary judgment); *Dole v. Elliot Travel & Tours, Inc.*, 942 F.2d 962, 968–69 (6th Cir. 1991) (providing that a court may not consider unsworn statements in evaluating a motion for summary judgment).

In response to Defendants' summary judgment motion, Plaintiff presents two pieces of evidence to support his allegations: His Declaration and the Declaration of his expert, Dr. Johnson. In his Declaration, Plaintiff states that (1) he was advised by medical staff at Vanderbilt that his hip required surgery and follow up care; and (2) he did not timely receive surgical intervention, follow-up appointments, or the recommended follow-up care [Doc. 105-1 ¶¶ 8, 9–13; 16–17]. But Plaintiff's allegations regarding what various medical providers allegedly told him are inadmissible hearsay. *See, e.g.*, *King v. Alexander*, 574 F. App'x 603, 606 (6th Cir. 2014) (holding that plaintiff's affidavit detailing previous doctors' medical instructions was inadmissible hearsay insufficient to create a genuine dispute of material fact); *Dunavant v. Frito-Lay, Inc.*, No. 1:11-CV-28, 2013 WL 816673, at *4 (M.D. Tenn. Mar. 5, 2013) (holding plaintiff's affidavit testimony regarding statements allegedly made by physician were inadmissible hearsay and therefore could not be considered at summary judgment). And Plaintiff's testimony as to his physical condition and symptoms because of the County's alleged failure to timely schedule and provide follow-up orthopedic care is insufficient for liability to attach to Lincoln County for the alleged failures, particularly given the undisputed testimony that QCHC was responsible for the medical care of inmates at the Lincoln County Jail [*See, e.g.*, Doc. 89 ¶ 11; Doc. 90 ¶ 10].

Plaintiff's additional support for his *Monell* claim is the Declaration of Dr. Johnson, who opines that there are "indications in the file" that Lincoln County refused to pay for recommended medical services and schedule follow-up care recommended in both the Vanderbilt and Peterson Orthopedic Records, thus deviating from recommended best correctional practices and depriving Plaintiff of constitutional protections [Doc. 105-2 ¶ 17–24]. But Dr. Johnson does not cite or identify these "indications." Instead, Dr. Johnson asks the Court to accept the truth of the contents of unidentified and unproduced records for the truth allegedly contained therein. So, his testimony

that Lincoln County refused to pay for services is likewise inadmissible hearsay and cannot create a genuine dispute of material fact. *See Alpert v. United States*, 481 F.3d 404, 409 (6th Cir. 2007) (disregarding hearsay evidence submitted in opposition to summary judgment).

Accordingly, Plaintiff has not presented any evidence to support his allegation that Lincoln County's alleged attempt to save costs is the moving force behind a failure to provide him with medically necessary health care. Plaintiff has not presented evidence of any written policy preventing inmates from receiving healthcare (to save costs or otherwise), nor has he presented any evidence that Lincoln County has a history of failing to provide adequate healthcare to save costs. *See, e.g.*, *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005) (holding a "custom of tolerance or acquiescence" theory of *Monell* liability requires the plaintiff to prove, in part, "the existence of a clear and persistent pattern of unconstitutional conduct" (citing *Doe v. Claiborne Cnty.*, 103 F.3d 495, 508 (6th Cir. 1996))). And Sheriff McConnell's sworn testimony establishes that she did not prevent Plaintiff's access to healthcare and is not aware that anyone else did so [Doc. 88 ¶¶ 6–9]. *See Alsaada v. City of Columbus*, 536 F. Supp. 3d 216, 270 (S.D. Ohio 2021) (noting ratification theory of *Monell* liability requires plaintiff to "demonstrat[e] that an official with final decision-making authority ratified illegal actions" (citing *Lipman v. Budish*, 974 F.3d 726, 747 (6th Cir. 2020)).

Rather, the competent summary judgment evidence demonstrates that, immediately after the assaults, Plaintiff was transported for medical treatment. First, to the Lincoln Health System, where Plaintiff was provided pain medication and had a laceration repaired [Doc. 90 ¶ 12; Doc. 94-1], then to Vanderbilt for treatment of his hip [Doc. 90 ¶ 12; Doc. 94-2]. And the discharge summary from Vanderbilt shows that the treating orthopedic surgeon recommended conservative treatment with weight bearing as tolerated [Doc. 90 ¶ 13; Doc. 94-2]. When Plaintiff was returned

to the Jail, he was under the care of QCHC, who made all medical decisions for Plaintiff's treatment [Doc. 89 ¶¶ 11–12]. And the QCHC treating physician who evaluated Plaintiff upon his return noted that Plaintiff's medical records indicated surgery was not required, that Plaintiff stated he felt "fine," and that he requested to return to general population [*See* Doc. 94-3, at 3].

Further, Plaintiff has not presented any evidence that follow-up orthopedic care was denied or delayed because of Lincoln County policy, practice, or custom. Plaintiff was transported to an orthopedic specialist in March 2024 [Doc. 105-1 ¶ 12]. His kiosk requests for accommodations, including a new mattress and shoes, were granted [Doc. 92-4, at 1–9]. And when Plaintiff later requested information regarding Dr. Byrd, that information was provided and arrangements were made through QCHC for orthopedic evaluation [*Id.* at 9, 11]. Thus, Plaintiff has failed to set forth proof from which a reasonable jury could find that Lincoln County was the cause of any alleged delay or denial of any follow-up treatment Vanderbilt doctors recommended.

Therefore, the Court finds Plaintiff has failed to present competent evidence to support a *Monell* claim against Lincoln County for the denial of constitutionally adequate medical care and Defendants are entitled to judgment as a matter of law.

## IV. CONCLUSION

For the reasons set forth above, Defendants' motion for summary judgment [Doc. 95] is **GRANTED** and this action will be **DISMISSED WITH PREJUDICE**.

**SO ORDERED. AN APPROPRIATE JUDGMENT ORDER WILL ENTER.**

*/s/ Charles E. Atchley, Jr.*
**CHARLES E. ATCHLEY, JR.**
**UNITED STATES DISTRICT JUDGE**